UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

VIRGINIO FUENTES,                        )
                                         )
             Plaintiff,                  )
                                         )
v.                                       )        Case No. 4:22-CV-590 RHH
                                         )
KILOLO KIJAKAZI,                         )
Acting Commissioner of Social Security,  )
                                         )
             Defendant,                  )

MEMORANDUM AND ORDER

Plaintiff Virginio Fuentes seeks review of the decision of Defendant Acting Social Security

Commissioner Kilolo Kijakazi, denying his application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act, and Supplemental Security Income ("SSI") under Title

XVI.  Because the Court finds that substantial evidence supports the decision to deny benefits, the

Court affirms the denial of Plaintiff's application.

I.     Background and Procedural History

On April 24, 2017, and May 24, 2017, respectively, Plaintiff filed applications for SSI and

DIB, alleging he was disabled as of January 1, 2015, due to sleep apnea, bipolar and depression.

(Tr. 209, 491-500, 505-511)   The Social Security Administration ("SSA") initially denied

Plaintiff's claims in May 2017, and he filed a timely request for a hearing before an administrative

law judge ("ALJ").  (Tr. 248-254, 256-270)  The SSA granted Plaintiff's request for review and

conducted hearings in November 2018 and April 2019.  (Tr. 182-207, 167-181)

In a decision dated July 22, 2019, the ALJ accepted an amended alleged onset date of

disability of March 5, 2016.  (Tr. 228-236)  She determined that Plaintiff "has been under a

disability as defined in the Social Security Act since March 5, 2016, the amended alleged onset

date of disability", and granted benefits.  (*Id.*)  On February 18, 2020, the SSA Appeals Council

vacated the ALJ's opinion, and remanded the case for further proceedings.  (Tr. 237-245)

The ALJ conducted a third hearing in January 2021.  (Tr. 125-166)  After reverting to the

original alleged onset date[1], the ALJ determined that Plaintiff "has not been under a disability, as

defined in the Social Security Act, from January 1, 2015, through the date of this decision[.]"  (Tr.

7-30)  Plaintiff subsequently filed a request for review of the ALJ's decision with the SSA Appeals

Council, which denied review.  (Tr. 1-6)  Plaintiff has exhausted all administrative remedies, and

the ALJ's decision stands as the Commissioner's final decision.  *Sims v. Apfel*, 530 U.S. 103, 106-

07 (2000).

## II.    Evidence Before the ALJ

During the initial hearing on November 14, 2018, Plaintiff, born July 5, 1980, testified that

he lived in an apartment with his girlfriend of approximately seven months.  (Tr. 186-187)  Prior

to that, he lived with his fiancé, but they broke up after one of his hospital stays.  (Tr. 187)[2]

Plaintiff shared a four-year old son with his ex-fiancé.  (Tr. 189)  On a daily basis he picked his

---

[1] The ALJ explained her decision to revert to the original alleged onset date as follows:

> The claimant is alleging disability since January 1, 2015.  The claimant
> previously amended the alleged onset date after the prior hearing; however,
> the amended onset date was based upon the testimony of the medical expert
> given at the last hearing (Exhibits 15D, 16D).  Because that prior testimony
> is no longer being followed in its entirety, fundamental fairness requires the
> undersigned to deny the requested amended onset date, consistent with the
> directions of the Appeals Council.  Therefore, this decision will consider
> the evidence from the original alleged onset date of January 1, 2015 through
> the date of this decision.

(Tr. 10)

[2] Plaintiff testified he was with his fiancé for five or six years, and that he was able to stay with her
despite his difficulty interacting with others because they were in love.  (Tr. 193)

son up from childcare and drove him to his parents' home[3], where his fiancé was living.  (Tr. 189-190)

With respect to household chores, Plaintiff stated he mostly did the vacuuming, sweeping and dusting, and he and his girlfriend both did the laundry and grocery shopping.  (Tr. 187-189) Besides transporting his son, Plaintiff spent his days watching television and reading on his phone. (Tr. 190)

Plaintiff stated he had held approximately 30 jobs during his lifetime, with several being full-time but the majority part-time.  (Tr. 191-192)  Plaintiff stated his positions lasted anywhere from three hours to several months.  (Tr. 192)  At one point he had a job coaching high school soccer students, but was let go because he developed a "weird psychosis" that prevented him from talking.  (Tr. 196)

When the ALJ asked Plaintiff why he believed he was disabled, Plaintiff responded as follows:  "I've been diagnosed with bipolar since I was 19 and I just haven't been able to hold a full-time job, whether it be like I—you know, my ADHD or I like couldn't get along with my managers or my co-workers."  (Tr. 186)  He elaborated by stating that he experienced mood swings, and at time felt paranoid at work, believing managers were laughing at him or ganging up on him.  (Tr. 199)  He further stated that he had suicidal thoughts at times.  (Tr. 200)  Plaintiff testified that he had tried different medications to address his difficulties, and that presently he was on drugs that are "kind of mild" but effective.  (Tr. 193, 200)

The ALJ adjourned the hearing, stating that she might need to obtain more information from Plaintiff's treating psychiatrist or refer the case out for an independent medical opinion.  (Tr. 205-206)  The parties reconvened on April 30, 2019, and the ALJ heard testimony from Paul

---

[3] Plaintiff had a driver's license, with no restrictions on it.  (Tr. 189)

Wiese, PhD, a psychologist and independent medical expert.  Having reviewed the medical evidence of record, Dr. Wiese testified that he believed Plaintiff suffered from bipolar I disorder with mania and psychotic features.  (Tr. 172)  Dr. Wiese concluded that Plaintiff had moderate limitations in understanding, remembering, or applying information, and adapting or managing himself, and marked limitations in interacting with others, and concentrating, persisting or maintaining pace.  (Tr. 173)

As noted above, on July 22, 2019, the ALJ issued an opinion in which she found that Plaintiff had been disabled under sections 216(i) and 223(d) of the Social Security Act since March 5, 2016, the amended alleged onset date.  (Tr. 228-236)  The SSA Appeals Council reviewed the decision, however, finding "there was an error of law and the actions, findings or conclusions were not supported by substantial evidence (20 CFR 404.970 and 416.1470)."  (Tr. 239)  The Appeals Council remanded the case to the ALJ for further proceedings.  (Tr. 237-245)

The ALJ held a third hearing on January 20, 2021.[4]  Jeffrey Andert, PhD, a licensed psychologist, reviewed the evidence of record and testified as an independent medical expert.   (Tr. 135-159)  Dr. Andert stated that Plaintiff had the medically determinable impairments of severe depressive disorder and bipolar disorder with psychotic features at times.[5]  (Tr. 136)  He testified that Plaintiff had moderate limitations in his ability to understand, remember and apply information, maintain social functioning, and maintain concentration, persistence and pace.  (Tr.

---

[4] The ALJ described the purpose of the hearing as follows:  "Now basically because this is an AC remand, the issues that I noticed, counsel, and correct me or add to if I miss anything, and this is they have an issue with an onset date, they have an issue with the step three support and an issue with the substance use issue, the earnings issue, and they even said something about a 12 month discontinued impairment issue."  (Tr. 130)  Plaintiff's counsel agreed with the ALJ's summary of the issues to be addressed on remand.  (*Id.*)
[5] Dr. Andert described the latter condition as constituting Plaintiff's primary impairment, and ranging from moderate to severe in intensity.  (Tr. 136)

138)  Plaintiff had marked limitation in his ability to adapt and manage himself.  (Tr. 138-139)

Dr. Andert noted the pattern of Plaintiff's treatment was "rather sporadic," and that the infrequent

contact with Dr. Taca may have necessitated Plaintiff's inpatient hospitalizations.  (Tr. 139)

With respect to work-related functional limitations, Dr. Andert opined that Plaintiff would

be limited to basic, simple, routine and repetitive work, and would need to work toward a daily

quota productivity-wise, rather than in a fast-paced setting such as an assembly line.  (Tr. 140)  He

stated Plaintiff should be limited to occasional contact with the general public and a small group

of co-workers, but could interact freely with authority figures or supervisors.  (*Id.*)  The following

exchange took place between Dr. Andert and Plaintiff's counsel:

> Q (by counsel)    Doc, the real issue here is that of reliability, inconsistency
> and I wonder if you agree with Dr. Taka (sic) with regard to him making
> these attempts but then developing symptoms which lead to him losing the
> jobs?  Would you agree with that?
>
> A        I don't think there is sufficient information to know why he
> actually left those jobs, what happened with them.  I understand Dr. Taka's
> (sic) conclusion was and Exhibit 10F, page one, that his inability to maintain
> constant employment involves a severe mental illness with paranoid
> thoughts, depression, irritability, anxiety or poor work history.  I understand
> his report about that.  I didn't find that documented other than the report of
> the claimant and his parents to healthcare providers and those symptoms
> again have been relatively well managed other than those two
> hospitalizations.  The nature of his impairment is such I think as I indicated
> under the functional limitations there would likely be limitations to the
> extent that I noted.  Whether a work setting exacerbates his condition or
> makes his symptoms more acute I don't think we have sufficient
> information to come to that conclusion….I don't think we really know why
> he left each of those jobs.

(Tr. 155-156)  Dr. Andert finally stated that with proper treatment and medication management,

together with the prescribed limitations, Dr. Andert would expect that Plaintiff's issues with

respect to attendance and punctuality would be within an acceptable range.  (Tr. 156-158)

A vocational expert testified at the hearing.  (Tr. 160-165)  The ALJ asked the vocational expert to consider a hypothetical individual similar in age and education to Plaintiff, with no prior relevant work, and with the following limitations:

> So non exertional and there is no restrictions because the claimant is younger so it can be at any exertional level, able to [l]earn, remember and carry out simple, routine tasks, able to use reason and judgment to make simple and routine work related decisions, able to work without a fast paced production.  In other words no fast paced and more of an end work day measurement rather than a constant pace as well….Able to complete simple, routine tasks in a timely manner.  That is as long as it is in the parameters I prescribed, able to avoid distractions to perform simple and routine tasks, able to adapt to gradual [changes] in job settings and job duties, able to work in close proximity to no more than six coworkers but involving no tandem tasks…Basically working with objects rather than people, no assembly line work, able to sustain an ordinary routine simply because of tasks on regular basis, able to work without needing a lot of lengths of rest period during the day, while performing simple and routine task[s], no direct interaction with the public.  The public may be present but job tasks do not require interaction.  Limited interaction with coworkers and no direct interaction with the public.  Would that person be able to do any jobs?

(Tr. 160, 162-163)  The vocational expert opined that such an individual would be able to work as a laundry sorter, folder, or lens inserter.[6]  (Tr. 163-164)  The vocational expert further testified that if the employee consistently experienced two or more unexcused absences per month, he would not be able to maintain employment.  (Tr. 164)  With respect to off-task behavior, the ALJ stated that with these positions, "there is an end day production but typically there is an expectation of completing them.  If you are off more and reaching 15 percent it would impede.  It would be a noticeable impact on your production for the day."  (Tr. 165)

With regard to Plaintiff's medical records, the Court adopts the facts that Plaintiff set forth in his Statement of Uncontroverted Material Facts, which the Commissioner admitted.  (ECF Nos.

---

[6] The vocational expert stated that laundry sorter and folder involved light, unskilled work, and lens inserter involved sedentary, unskilled work.  (Tr. 163-164)

23-1, 26-1)  The Court will cite to specific portions of the transcript as needed to address the parties' arguments.

### III.      Standards for Determining Disability Under the Social Security Act

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled.  *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8ᵗʰ Cir. 2001); *Baker v. Sec'y of Health & Hum. Servs.*, 955 F.2d 552, 555 (8ᵗʰ Cir. 1992).  Under the Social Security Act, a person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  *Accord Hurd v. Astrue*, 621 F.3d 734, 738 (8ᵗʰ Cir. 2010). The impairment must be "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he [or she] lives, or whether a specific job vacancy exists for him [or her], or whether he [or she] would be hired if he [or she] applied for work."  42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8ᵗʰ Cir. 2011) (discussing the five-step process).  At step one, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611.  At step two, the Commissioner determines whether the claimant has "a severe medically determinable physical or mental impairment that meets the [twelve-month] duration requirement

in § [404.1509 or 416.909], or a combination of impairments that is severe and meets the duration requirement"; if the claimant does not have a severe impairment, the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *McCoy*, 648 F.3d at 611.  To be severe, an impairment must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c).  At step three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611.  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process.  20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to step four, the Commissioner assesses the claimant's residual functional capacity ("RFC"), 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), which is "the most [a claimant] can still do despite [his or her] limitations," 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  *See also Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).  At step four, the Commissioner determines whether the claimant can return to his or her past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.   20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611.  If the claimant can perform his or her past relevant work, the claimant is not disabled; if the claimant cannot, the analysis proceeds to the next step.  20 C.F.R. §§ 404.1520(a)(4)(iv), 404.920(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611.  At step five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an

adjustment to other work, the claimant will be found disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g),  416.920(a)(4)(v), 416.920(g); *McCoy*, 648 F.3d at 611.

Through step four, the burden remains with the claimant to prove that he or she is disabled. *Moore*, 572 F.3d at 523.  At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform.  *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. §§ 404.1520(g), 416.920(g).

## IV.    The ALJ's Decision

The ALJ applied the five-step evaluation set forth in 20 C.F.R. §§ 404.1520(a) and 416.920(a), and found that Plaintiff:  (1) had not engaged in substantial gainful activity since January 1, 2015, the alleged onset date; and (2) had the following severe impairment:  an affective disorder, variously diagnosed as depressive disorder and bipolar disorder with psychotic features, that significantly limited his ability to perform basic work activities as required by SSR 85-28. (Tr. 13-14)   At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 15-17)

The ALJ found that, although "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms", "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"  (Tr. 19)  The ALJ acknowledged that Plaintiff's treatment history included several acute episodes of increased symptoms due to his affective disorder, but the evidence did not show sustained limitations in his functioning.  (*Id.*)

9

Further, while the historical medical evidence showed past hospitalizations for psychosis, there was no medical evidence corresponding to the alleged onset date of January 1, 2015.  (*Id.*)

With respect to the medical opinions in the record, as relevant here[7] the ALJ gave little weight to the opinion of Dr. Arturo Taca, Plaintiff's treating psychiatrist.  Regarding Dr. Taca's first statement, offered in October 2018, the ALJ stated the medical evidence did not support Dr. Taca's findings of marked or extreme limitations in Plaintiff's functioning, a reduced pace of production, or the likelihood of three or more missed days of work per month.  (Tr. 22)  She observed that while treatment records from Dr. Taca noted a regularly constricted affect and fair insight and judgment, they otherwise failed to document any other objective findings of abnormalities, and overall Plaintiff's examinations were "fairly benign."  (*Id.*)  The ALJ noted Dr. Taca did not see Plaintiff regularly for treatment, and when they did meet Dr. Taca recommended neither more intensive outpatient care nor inpatient care.  (*See* Tr. 23 (Dr. Taca's "own response in treatment is inconsistent with the limitations expressed above, as someone with marked and extreme limitations would reasonably be recommended to have frequent, ongoing, and regular psychiatric care in addition to other services such as counseling or a caseworker to assist with stability in his mental health conditions.")).

As to Dr. Taca's second statement, from October 2019, the ALJ stated that although Dr. Taca said Plaintiff had "definitely" been mentally ill since March 2016, "his own treatment records, reportedly going back to 2007, lacked any documentation of worsening of symptoms or any objective findings of abnormalities in his functioning."  (Tr. 23)  Furthermore, "Dr. Taca stated

---

[7] Although Plaintiff complains the ALJ improperly discounted the opinion of Marsha Toll, Psy.D., the restrictions placed by the ALJ more than accommodated for the mild limitations found by Dr. Toll.  Further, while Plaintiff complains the ALJ improperly discounted the opinion of Judee Bland, M.D. as to Plaintiff's physical limitations, as noted above Plaintiff did not claim to be disabled as a result of any such limitations.

the claimant had been ill with psychotic symptoms for a continuous period of 12 months since at least March 2016, but the treatment record shows large gaps in his treatment of the claimant, which would call into question his ability to assess the claimant's functioning for an ongoing 12 month period, including medication compliance." (*Id.*)  The ALJ concluded that Dr. Taca's opinion improperly relied in part on supposition, "such as his suspicion the claimant had struggled with his psychiatric symptoms throughout his adult life despite a complete lack of evidence in support of that statement." (*Id.*)

The ALJ also gave little weight to the opinion of Dr. Paul Wiese, PhD, the medical expert who testified during the hearing on April 30, 2019. (Tr. 23-24)  She concluded Dr. Wiese's opinion appeared to be "heavily influenced by Dr. Taca's own opinion, which is not fully supported as discussed above." (Tr. 24)  Further, upon questioning Dr. Wiese was "very limited in his ability to actually cite to the record", and his opinion was not supported by the medical evidence. (*Id.*)

Finally, the ALJ gave great weight to the opinion of Dr. Jeffrey Andert, who testified as a medical expert during the January 2021 hearing.  The ALJ explained her conclusion as follows:

> Dr. Andert offered a more extensive and detailed review of the medical evidence in his testimony than was offered by Dr. Wiese or Dr. Taca. Further, his testimony was consistent with the medical evidence and the treatment history of the claimant, and he liberally cited to the record in support of his opinion.  He assessed the frequency of Dr. Taca's involvement with the claimant and noted periods of time without regular care, which left holes in the ability to assess his ongoing functioning during the times when he did not receive care.  Further, Dr. Andert avoided making assumptions unsupported by the medical records, such as assuming the claimant's mental health impairments had impacted his work history as alleged without evidence in support thereof.  As noted above, the claimant himself said he left at least three more recent jobs for "other reasons."  Dr. Andert's assessment of the medical evidence was thorough and consistent with the objective evidence, including clinical signs, in light of the diagnoses[] cited and relied upon by him in his evaluation of the claimant's limitations.

(Tr. 27)

After "careful consideration of the entire record," the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels, but with the following nonexertional limitations:

> [H]e is able to learn, remember, and carry out simple, routine tasks. He is able to use reason and judgment to make simple, routine work-related decisions. He should not perform fast-paced or constant-paced work but is able to meet an end of workday measurement. The claimant is able to work at an appropriate and consistent pace while performing simple, routine tasks including maintaining concentration, persistence and pace for at least two hour intervals, and complete simple, routine tasks in a timely manner. He is able to ignore or avoid distractions while performing simple, routine tasks. He is able to adapt to gradual changes in job setting and duties. The claimant is able to sustain an ordinary routine and regular attendance at work while performing simple, routine tasks. He is able to work a full day without needing more than the allotted number or length of rest periods during the day while performing simple, routine tasks. The claimant is able to work in close proximity to or with small groups of others, with no more than six people, without interrupting or distracting them while performing simple, routine tasks but not involving tandem tasks such as assembly line work (he should not perform any assembly-line work). He is able to interact appropriately with the public, co-workers, and supervisors but tasks should be working primarily with objects rather than people.

(Tr. 17)  Based on the vocational expert's testimony, the ALJ found that Plaintiff had the RFC to perform jobs that existed in significant numbers in the national economy, such as classifier/laundry sorter, folder, and lens inserter.  (Tr. 29)  The ALJ therefore concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from January 1, 2015, through the date of the decision.  (Tr. 30)

## V.     Discussion

Plaintiff claims the ALJ failed to properly evaluate the medical opinion evidence in the record.  Plaintiff further asserts the RFC the ALJ constructed was not supported by substantial evidence.  The Commissioner counters that substantial evidence in the record as a whole supports the ALJ's decision that Plaintiff is not disabled.

12

A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'"  *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8ᵗʰ Cir. 2017) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8ᵗʰ Cir. 2000)). A court must consider "both evidence that supports and evidence that detracts from the ALJ's determination, [but it] 'may not reverse the Commissioner's decision merely because substantial evidence supports a contrary outcome.'"  *Id.* (internal quotation marks and citations omitted).

A court does not "'reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'"  *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8ᵗʰ Cir. 2012) (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8ᵗʰ Cir. 2006)).  Therefore, the Court must affirm the ALJ's decision if "'it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]'"  *Wright v. Colvin*, 789 F.3d 847, 852 (8ᵗʰ Cir. 2015) (quoting *Perkins v. Astrue*, 648 F.3d 892, 897 (8ᵗʰ Cir. 2011)).

B.  Medical Opinion Evidence

As noted above, Plaintiff claims the ALJ failed to properly assess the opinions of the treating psychiatrist and the two consulting experts.  Because Plaintiff filed his applications for benefits after March 2017, the ALJ's treatment of medical opinion evidence is governed by 20 C.F.R. §§ 404.1520c and 416.920c.  Under these regulations, ALJs are directed to consider all medical opinions equally and evaluate their persuasiveness according to several specific factors – supportability, consistency, the medical source's relationship with the claimant, specialization, and other factors such as the source's understanding of the Social Security Administration's disability

13

policies.  20 C.F.R. §§ 404.1520c(c), 416.920c(c).  ALJs must "articulate in [their] determination or decision how persuasive [they] find all of the medical opinions and all of the prior administrative medical findings in [the] case record."  20 C.F.R. §§ 404.1520c(b), 416.920c(b).

In evaluating the persuasiveness of a medical opinion, the factors of supportability and consistency are the most important for an ALJ to consider, and the ALJ must "explain how [s]he considered the supportability and consistency factors . . . in [the] determination or decision."  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).[8]  An ALJ's failure to address either the consistency or supportability factor in assessing the persuasiveness of a medical opinion requires reversal. *Bonnett v. Kijakazi*, 859 Fed. Appx. 19 (8th Cir. 2021) (unpublished) (per curium) (citing *Lucas v. Saul*, 960 F.3d 1066, 1069-70 (8th Cir. 2020) (remanding where ALJ discredited physician's opinion without discussing factors contemplated in regulation, as failure to comply with opinion-evaluation regulation was legal error)).  See also *Starman v. Kijakazi*, No. 2:20-CV-00035-SRC, 2021 WL 4459729, at *5 (E.D. Mo. Sept. 29, 2021).  An ALJ need not explain in his or her decision how he or she considered the other factors.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

1.  The ALJ Properly Rejected Dr. Taca's Medical Opinion

In support of his claim, Plaintiff originally submitted an October 17, 2018 mental medical source statement from his treating psychiatrist, Dr. Taca.  (Tr. 1372-1375)  Dr. Taca listed Plaintiff's mental diagnosis as bipolar disorder type I with psychotic features.  He found that

---

[8] "Supportability.  The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

"Consistency.  The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

Plaintiff was moderately limited[9] in his ability to function independently.  He found that Plaintiff was markedly limited[10] in his ability to initiate and complete tasks in a timely manner; ignore or avoid distractions; sustain ordinary routine and regular attendance; follow one or two step oral instructions to carry out a task; use reason and judgment to make work related decisions; understand and learn terms, instructions and procedures; work a full day without needing more than the allotted number or length of rest periods; distinguish between acceptable and unacceptable work performance; ask simple questions or request help; and respond appropriately to requests, criticism, suggestions, correction and challenges.  Finally, he found that Plaintiff was extremely limited[11] in his ability to regulate emotions, control behavior, and maintain wellbeing in a work setting; keep social interactions free of excessive irritability, argumentativeness, sensitivity or suspiciousness; and maintain socially acceptable behavior.

Dr. Taca concluded that if required to perform simple tasks in a low-stress environment for a full workweek, Plaintiff's overall pace of production would be 31% or more below average, and he further would miss work three times per month or more.  He stated Plaintiff could perform in a setting where contact with the general public was only casual and infrequent, but could neither preform in proximity to coworkers without being distracted by them or distracting them, nor consistently perform for supervisors without exhibiting insubordinate behavior in response to supervision.

The ALJ found Dr. Taca's opinion unpersuasive, as follows:

[9] "Moderate" is defined as follows:  "Functioning in this area independently, appropriately, effectively, and on a sustained basis is fair."  (Tr. 1372)
[10] "Marked" is defined as follows:  "Functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited."  (Tr. 1372)
[11] "Extreme" is defined as follows:  "Not able to function in this area independently, appropriately, effectively, and on a sustained basis."  (Tr. 1372)

The medical evidence does not support marked or extreme limitations in his functioning, a reduced pace of production, or the likelihood of three or more missed days of work per month.  The treatment records from Dr. Taca noted a regularly constricted affect and fair insight and judgment.  However, the treatment records did not document any other objective findings of abnormalities in his examinations.  Overall, the examinations were fairly benign.  Further, he did not see the claimant regularly for treatment.  When he saw him, he did not recommend intensive outpatient care or inpatient care, nor did he urge more frequent and regular care to control his mental health symptoms.  His own response in treatment is inconsistent with the limitations expressed above, as someone with marked and extreme limitations would reasonably be recommended to have frequent, ongoing, and regular psychiatric care in addition to other services such as counseling or a caseworker to assist with stability in his mental health conditions.

(Tr. 22-23)

In an opinion memorandum dated October 16, 2019, Dr. Taca noted Plaintiff's parents stated he had struggled to keep a job since the age of sixteen, because he "usually gets upset with the type of job, doesn't like the people he works with, and/or gets paranoid that his co-workers are against him in some way." (Tr. 1412) Dr. Taca opined that most of Plaintiff's inability to maintain constant employment revolved around his severe mental illness, including paranoid thoughts, irritability, depression, distraction, and anxiety.  He concluded that Plaintiff had been mentally ill since the March 5, 2016 onset date, and suspected the symptoms had been "a constant issue with [Plaintiff] throughout his adult life."  (*Id.*)

The ALJ found Dr. Taca's second opinion entitled to little weight, as follows:

Dr. Taca's opinion rely [sic] in part on supposition, such as his suspicion the claimant had struggled with his psychiatric symptoms throughout his adult life despite a complete lack of evidence in support of that statement.  Further, although he said the claimant had "definitely" been mentally ill since March 2016, his own treatment records, reportedly going back to 2007, lacked any documentation of worsening of symptoms or any objective findings of abnormalities in his functioning.  Finally, Dr. Taca stated the claimant had been ill with psychotic symptoms for a continuous period of 12 months since at least March 2016, but the treatment record shows large gaps in his treatment of the claimant, which would call into question his ability to assess the claimant's functioning for an ongoing 12 month period, including medication compliance.

16

(Tr. 23)

"Once the ALJ has decided how much weight to give a medical opinion, the Court's role is limited to reviewing whether substantial evidence supports this determination, not deciding whether the evidence supports the plaintiff's view of the evidence." *Beamer v. Saul*, No. 2:18-CV-00094 JAR, 2020 WL 1511350, at *7 (E.D. Mo. Mar. 30, 2020) (citation omitted). *See also Couch v. Berryhill*, No. 2:18 CV 46 DDN, 2019 WL 1992623, at *6 (E.D. Mo. May 6, 2019) (same).

The Court's review of the record establishes that the ALJ did not simply substitute her own interpretation for Dr. Taca's opinion. Instead, she carefully considered Plaintiff's medical records, and found the evidence did not support "marked or extreme limitations in his functioning, a reduced pace of production, or the likelihood of three or more missed days [of] work per month." (Tr. 22) She further found Dr. Taca's opinion unpersuasive because, although Plaintiff's treatment history showed two acute episodes of increased symptoms due to his affective disorder, the evidence did not demonstrate sustained limitations in his functioning. (Tr. 19) The ALJ thus concluded that Plaintiff had the mental RFC to perform sedentary or light unskilled work. (Tr. 29)

The record contains ample evidence supporting the ALJ's determination. For example, from his alleged onset date of January 1, 2015[12], through the date of the final hearing, a period of over six years, Plaintiff saw Dr. Taca fewer than ten times.[13] In his notes from their sessions, Dr.

---

[12] Plaintiff's first session with Dr. Taca during the relevant time frame did not take place until February 12, 2015, over a month after his alleged onset date and five months after his most recent previous visit. (Tr. 1354, 1356)

[13] Plaintiff often went long periods of time without seeing Dr. Taca. For example, after his February 12, 2015, appointment, Plaintiff did not return to Dr. Taca until August 29, 2016. (Tr. 725, 1352) He did not seek treatment with Dr. Taca at all during 2017.

Taca occasionally stated that Plaintiff's affect was constricted[14], but at other times said it was full.[15]  Dr. Taca consistently found Plaintiff:  (1) was well-groomed, cooperative, friendly, and alert/oriented x 3; (2) maintained good eye contact, regular speech, and logical, goal-directed thought processes; and (3) exhibited an absence of suicidal or homicidal intent, paranoia, delusions, and obsession.[16]  Dr. Taca frequently recommended that Plaintiff simply continue with his current medication regimen, and when he did make changes it was often out of concern for Plaintiff's weight rather than mental health.[17]  Finally, Dr. Taca always suggested that Plaintiff return to the clinic in four weeks, an interval that is inconsistent with treatment for severe mental impairment.[18]

In addition, the record contains evidence that Plaintiff himself reported participating in a number of daily activities, including driving, picking his son up from childcare, doing dishes and laundry, vacuuming, sweeping and dusting, driving, watching television, reading on his phone, shopping by computer, playing video games, completing puzzles, and spending time with others including, importantly, his son.  (Tr. 187-190, 624-625)

Upon consideration of the foregoing, the Court finds substantial evidence in the record supports the ALJ's determination with respect to Dr. Taca's medical opinion.[19]

2.  The ALJ Properly Credited Dr. Andert's Medical Opinion

---

[14] Tr. 1354 (2/12/15), 725 (8/29/16), 723 (10/20/16), 1443 (1/30/20).

[15] Tr. 1347 (2/22/18), 1344 (9/13/18), 1404 (2/5/19), 1463 (10/23/20).

[16] Tr. 1354 (2/12/15), 725 (8/29/16), 723 (10/20/16), 1347 (2/22/18), 1344 (9/13/18), 1404 (2/5/19), 1443 (1/30/20), 1463 (10/23/20).

[17] Tr. 1354, 726, 724, 1348, 1345, 1405, 1444, 1464.

[18] Tr. 1354, 726, 724, 1348, 1345, 1405, 1444, 1464.

[19] As noted above, the ALJ discounted Dr. Wiese's opinion because it "appear[ed] to be heavily influenced by Dr. Taca's own opinion, which is not fully supported[.]"  (Tr. 24)  Having found the ALJ was justified in her determination with respect to Dr. Taca's opinion, the Court finds her discounting of Dr. Wiese's opinion was supported by substantial evidence as well.

As noted above, Dr. Andert reviewed the evidence of record and testified as a non-treating medical expert during the hearing before the ALJ on January 20, 2021.  (Tr. 135-159)  He stated that a number of Dr. Taca's opinions and prescribed limitations were unsupported in the record, especially in light of Plaintiff's sporadic treatment history.  (Tr. 145-146, 148, 151, 155-156)  He concluded that with proper treatment and medication management, Plaintiff should be able to work within prescribed parameters.  (Tr. 140, 156-158)

In her written decision, the ALJ found Dr. Andert's opinion entitled to great weight.  (Tr. 27)  Specifically, she stated that Dr. Andert "offered a more extensive and detailed review of the medical evidence in his testimony than was offered by Dr. Wiese or Dr. Taca."  (*Id.*)  Furthermore, his testimony was consistent with the medical evidence and Plaintiff's treatment history, and he liberally cited to the record to support his opinions.  (*Id.*)  With respect to the periods of time during which Plaintiff did not receive regular care, the ALJ stated that unlike Dr. Taca, Dr. Andert "avoided making assumptions unsupported by the medical records, such as assuming the claimant's mental health impairments had impacted his work history as alleged without evidence in support thereof."  (*Id.*)[20]  The ALJ concluded as follows:  "Dr. Andert's assessment of the medical evidence was thorough and consistent with the objective evidence, including clinical signs, in light of the diagnoses [] cited and relied upon by him in his evaluation of the claimant's limitations."  (*Id.*)

As noted above, "[o]nce the ALJ has decided how much weight to give a medical opinion, the Court's role is limited to reviewing whether substantial evidence supports this determination, not deciding whether the evidence supports the plaintiff's view of

---

[20] The ALJ noted that Plaintiff himself acknowledged that he had left at least three recent jobs for "other reasons."  (Tr. 27)

the evidence." *Beamer*, 2020 WL 1511350, at *7 (citation omitted).  The Court finds substantial evidence in the record supports the ALJ's determination, especially because the ALJ did not rely exclusively on Dr. Andert's opinions to support her finding of non-disability.  Rather, as noted above, a review of the ALJ's decision shows that she reached her conclusion after considering and weighing all the relevant evidence of record, including the medical professionals' opinions and treatment notes, and Plaintiff's testimony and reported activities of daily living.  *See Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004) ("[T]he ALJ in this case did not rely solely on [the non-examining consultant's] opinion to reach his conclusions.  Rather, the ALJ relied on [the consultant's] opinion as one part of the record, which, as a whole . . . provides substantial support for his findings."); SSR 96-6P, 1996 WL 374180, at *1-3 (Soc. Sec. Admin. July 2, 1996) (an ALJ must treat expert opinion evidence of non-examining providers in conjunction with the other evidence of record).[21]

C.  RFC Determination

Plaintiff asserts the RFC the ALJ constructed is not supported by substantial evidence.  RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations.  20 C.F.R. § 404.1545(a)(1).  *See also Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  *Moore*, 572 F.3d at 523 (internal quotation marks and citation omitted).

---

[21] To the extent Plaintiff complains that the ALJ improperly credited Dr. Andert's opinion and discounted Dr. Taca's, when both doctors assessed Plaintiff's functional capacity from the same limited information, the Court notes that "[u]ltimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (citations omitted).

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (internal quotation marks and citation omitted). "However, there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citations omitted). An ALJ "is not limited to considering medical evidence exclusively," as even though the "RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citations omitted). While the Court recognizes that an ALJ "may not draw upon his own inferences from medical reports," *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000), the Eighth Circuit has held that the "interpretation of physicians' findings is a factual matter left to the ALJ's authority." *Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016) (citation omitted).

With respect to Dr. Taca's opinion, as noted above the ALJ did not simply substitute her interpretation for his, but instead supported her conclusion that the opinion was not persuasive with specific citations to the record. Further, she properly credited the opinion of Dr. Andert, and incorporated the doctor's posited limitations into both the hypothetical she posed to the vocational expert and the RFC she constructed. The ALJ thus did not err in formulating Plaintiff's RFC and determining whether Plaintiff is disabled.

## VI.    Conclusion

As long as there is substantial evidence in the record that supports the ALJ's decision, this Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). *See also Buckner v. Astrue*, 646 F.3d 549,

556 (8ᵗʰ Cir. 2011) (internal quotation marks and citation omitted) (An ALJ's decision is not to be disturbed "so long as the ... decision falls within the available zone of choice.  An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusion had [the Court] been the initial finder of fact.").  Here, the ALJ's decision, and therefore, the Commissioner's, was within the "zone of choice".  *See Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8ᵗʰ Cir. 2017).

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports the ALJ's decision that Plaintiff "has not been under a disability, as defined in the Social Security Act, from January 1, 2015, through the date of this decision[.]"  (Tr. 30)

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of Defendant denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.


Dated this 18th day of September, 2023.


RODNEY H. HOLMES
UNITED STATES MAGISTRATE JUDGE

22